# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LAWRENCE ROSENBERG,

    Plaintiff,

      v.

UNITED STATES DEPARTMENT OF
IMMIGRATION AND CUSTOMS
ENFORCEMENT, *et al.*,

    Defendants.

Civil Action No. 12-452 (CKK)

## MEMORANDUM OPINION
### (August 11, 2013)

Plaintiff Lawrence Rosenberg submitted Freedom of Information Act requests to various federal agencies seeking, among other things, records related to the raid of Agriprocessors, Inc., meatpacking plant and the subsequent prosecution of Sholom Rubashkin. Dissatisfied with the agencies' responses to his request, the Plaintiff filed suit against United States Immigration and Customs Enforcement, the United States Marshals Service, the Executive Office for United States Attorneys, and the Federal Bureau of Investigation. Presently before the Court is the FBI's [47] Motion for Summary Judgment, and the Plaintiff's [51] Cross-Motion for Summary Judgment. Upon consideration of the pleadings,[1] the documents submitted to the Court for *in camera* review, the relevant legal authorities, and the record as a whole, the Court finds FBI failed to demonstrate that it conducted an adequate search for potentially responsive documents, and also failed to justify why certain information was redacted pursuant to Exemptions 6, 7(C)

---

[1] Def.'s Notice of Filing (*Vaughn* Decl.), ECF No. [46]; Def.'s Mot., ECF Nos. [47, 48]; Pl.'s Opp'n & Cross-Mot. ("Pl.'s Cross-Mot."), ECF Nos. [50, 51]; Def.'s Reply & Opp'n to Pl.'s Cross-Mot. ("Def.'s Reply"), ECF Nos. [55, 56]; Pl.'s Reply, ECF No. [57]; Pl.'s Suppl., ECF No. [60]; Def.'s Resp. to Pl.'s Suppl., ECF No. [61].

and 7(E), but is not liable for failing to produce responsive documents to the Plaintiff "promptly," and properly invoked Exemption 3. Additionally, because the Plaintiff did not articulate his challenge to the FBI's contention that certain interviewees were implicitly assured their identities would remain confidential until his reply brief, the Court shall provide the FBI an opportunity to supplement its showing as to the use of Exemption 7(D). The FBI sufficiently justified its use of the remaining Exemptions applied to the documents produced in part or withheld in response to the Plaintiff's request. Accordingly, the FBI's Motion for Summary Judgment is GRANTED IN PART and HELD IN ABEYANCE. The Plaintiff's Cross-Motion for Summary Judgment is HELD IN ABEYANCE and otherwise DENIED. An appropriate Order accompanies this Memorandum Opinion.

## I. BACKGROUND

Sholom Rubashkin managed a kosher meatpacking company in Postville, Iowa, named Agriprocessors, Inc., which at one point employed over one thousand individuals. *United States v. Rubashkin*, 655 F.3d 849, 853 (8th Cir. 2011). In May 2008, Immigration and Customs Enforcement raided the plant, and arrested nearly four hundred employees for immigration violations, bringing criminal charges against most of the arrestees. *Id.* at 854. "Around that time," the United States Attorney's Office in the Northern District of Iowa informed Mr. Rubashkin that he was the target of a federal investigation for financial and immigration crimes. *Id.* Mr. Rubashkin was arrested in November 2008 and charged by indictment with 163 counts, including fourteen counts each of bank and wire fraud, and sixty nine counts of harboring undocumented aliens for profit. After the initial indictment of Mr. Rubashkin, but before the superseding indictment and trial, an Agriprocessors employee moved to recuse Chief Judge Linda Reade from presiding over a related immigration fraud matter. *Id.* Chief Judge Reade

denied the motion to recuse, explaining that in her role as Chief Judge, she needed to help "prepare for processing hundreds of anticipated immigration arrestees, which included arranging for visiting judges to travel to Waterloo, Iowa to handle arraignments." *Id.* at 855. Mr. Rubashkin's trial counsel was aware of this order, but did not move to recuse Chief Judge Reade from the proceedings concerning Mr. Rubashkin. *Id.* Mr. Rubashkin was eventually convicted of seventy one counts of bank, mail, and wire fraud, money laundering, and false statements to bank, in addition to fifteen counts of willful violations of orders of the Secretary of Agriculture. *Id.* Relying on documents obtained through a Freedom of Information Act Request submitted prior to his trial, Mr. Rubashkin subsequently moved for a new trial, or for discovery, which the trial court denied. *Id.* at 856. The Eighth Circuit affirmed the denial of Mr. Rubashkin's motion for a new trial, as well as his underlying conviction and sentence on September 16, 2011. *Id.* at 869.

By letter dated September 28, 2011, the Plaintiff submitted a Freedom of Information Act ("FOIA") request to the FBI seeking, among other things: (1) "any and all information relating to the raid of Agriprocessors, Inc., a meatpacking plant in Postville, Iowa, on May 12, 2008 ("the raid") and the subsequent prosecution of Sholom Rubashkin"; (2) "any and all information relating to actions proposed to take place in year 2000 against Agriprocessors, Inc., as documented in the Des Moines Register's August 6, 2011 article, 'Immigrant Raid Halted in 2000 on Election Fear, Ex-Agent Says'"; (3) "any and all information relating to any actions considered to take place against Iowa Turkey Products, Inc. of Postville, IA"; (4) "any and all information relating to the class action case *Salazar v. Agriprocessors,* 527 F. Supp. 2d 873 (N. D. Iowa 2007)"; and (5) any and all documents reflecting communications between "any government agency or official" and over 101 individuals regarding Mr. Rubashkin or

Agriprocessors. Hardy Decl., Ex. A (Pl.'s FOIA Request), at 2-8. The Plaintiff's request included 39 numbered paragraphs outlining his specific requests. *See id.*

The FBI acknowledged the Plaintiff's request by letter dated October 5, 2011, assigning the request number 1174698. Def.'s Stmt. ¶ 3.[2] The FBI advised the Plaintiff that it would search the "indices to [the FBI's] Central Records System for the information responsive to this request." *Id.*; Hardy Decl., Ex. B (10/5/11 Acknowledgment Ltr.). Two weeks later, the FBI notified the Plaintiff that it located 1,223 potentially responsive pages. Hardy Decl., Ex. C (10/19/11 Ltr. FBI to Pl.). The letter advised the Plaintiff that if all of the potentially responsive pages were to be released, the Plaintiff would owe the FBI $112.30 in duplication fees to receive a paper copy or $20.00 to receive the release on a CD. *Id.* The letter indicated that

> No payment is required at this time. However, you must notify us in writing within thirty (30) days from the date of this letter of your format decision (paper or CD) and your commitment to pay the estimated fee. If we do not receive your commitment to pay within thirty (30) days of the date of this notification, your request will be closed.

*Id.* The FBI did not receive a response to its October 19, 2011, letter from the Plaintiff, and did not produce any documents in response to the request.

The Plaintiff filed suit on March 23, 2012. On September 7, 2012, the FBI processed the pages identified as potentially responsive to the Plaintiff's request. Hardy Decl. ¶ 11. Of the 1,233 pages initially identified, 257 were found to be duplicates. Second Hardy Decl. ¶ 8; Hardy Decl. ¶ 4. The FBI released 39 pages in full and 322 pages in part. Hardy Decl. ¶ 4. One hundred and fifty five pages were withheld in their entirety pursuant to various FOIA exemptions. *Id.* The remaining 450 pages were withheld because they are court materials sealed

---

[2] The Court shall refer to the FBI's or the Plaintiff's Statement of Material Facts ("Def.'s Stmt." or "Pl.'s Stmt."), or directly to the record, unless a statement is contradicted by the opposing party, in which case the Court may cite to either party's Response to the Statement of Material Facts ("Resp. Stmt.").

by the United States District Court for the Northern District of Iowa. *Id.*

## II. LEGAL STANDARD

Congress enacted FOIA to "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976) (citation omitted). Congress remained sensitive to the need to achieve balance between these objectives and the potential that "legitimate governmental and private interests could be harmed by release of certain types of information." *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992) (en banc) (citation omitted), cert. denied, 507 U.S. 984 (1993). To that end, FOIA "requires federal agencies to make Government records available to the public, subject to nine exemptions for categories of material." *Milner v. Dep't of Navy*, 131 S.Ct. 1259, 1261–62 (2011). Ultimately, "disclosure, not secrecy, is the dominant objective of the act." *Rose*, 425 U.S. at 361. For this reason, the "exemptions are explicitly made exclusive, and must be narrowly construed." *Milner*, 131 S.Ct. at 1262 (citations omitted).

When presented with a motion for summary judgment in this context, the district court must conduct a "de novo" review of the record, which requires the court to "ascertain whether the agency has sustained its burden of demonstrating that the documents requested . . . are exempt from disclosure under the FOIA." *Multi Ag. Media LLC v. Dep't of Agriculture*, 515 F.3d 1224, 1227 (D.C. Cir. 2008) (citation omitted). The burden is on the agency to justify its response to the plaintiff's request. 5 U.S.C. § 552(a)(4)(B). "An agency may sustain its burden by means of affidavits, but only if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Multi Ag Media*, 515 F.3d at 1227 (citation omitted). "If an agency's affidavit describes the justifications for withholding the information with specific

detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *Am. Civil Liberties Union v. U.S. Dept of Defense*, 628 F.3d 612, 619 (D.C. Cir. 2011) (citations omitted). "Uncontradicted, plausible affidavits showing reasonable specificity and a logical relation to the exemption are likely to prevail." *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 509 (D.C. Cir. 2011) (citation omitted). Summary judgment is proper when the pleadings, the discovery materials on file, and any affidavits or declarations "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). With these principles in mind, the Court turns to the merits of the parties' cross-motions for summary judgment.

## III. DISCUSSION

The FBI seeks summary judgment on the grounds it conducted an adequate search for responsive documents and properly withheld information pursuant to several Freedom of Information Act exemptions, individually and in combination. The Plaintiff cross-moves for summary judgment as to each of these issues, and further argues he is entitled to summary judgment on his claim that the FBI did not "promptly" produce responsive documents. Because the applicability of Exemption 7(C) in this context depends in part on the content of the documents, the Court ordered the FBI to provide it with unredacted copies of the responsive documents the FBI withheld or produced in redacted form to the Plaintiff. The Court begins with the Plaintiff's claim regarding the timeliness of the FBI's production, before turning to the adequacy of the FBI's search for documents and the specific exemptions invoked by the FBI.

*A.        Timeliness of the FBI's Production of Responsive Documents*

The Plaintiff moves for summary judgment on the grounds the FBI failed to timely produce documents responsive to his request.[3]   Pl.'s Cross-Mot. at 6-7.   The FBI notified the Plaintiff on October 19, 2011, that the agency had located 1,223 pages of potentially responsive materials, and indicated that if the agency did not receive the Plaintiff's commitment to pay any duplication fees within thirty days of October 19, the Plaintiff's request would be closed.   Hardy Decl., Ex. C.   The Plaintiff does not dispute the fact that he never responded to the FBI's letter. Consistent with the Department of Justice's FOIA regulations, the FBI discontinued processing the Plaintiff's request.   28 U.S.C. § 16.11(e) ("In cases in which a requester has been notified that actual or estimated fees amount to more than $25.00, the request shall not be considered received and further work shall not be done on it until the requester agrees to pay the anticipated total fee.").   Because the Plaintiff failed to comply with the applicable regulations, the FBI was not required to "make the records promptly available."   5 U.S.C. § 552(a)(3)(A)(ii).

The Plaintiff suggests that he was not required to respond to the FBI's October 19 letter because regulations "*deemed* Plaintiff to have agreed to pay that fee, remov[ing] any requirement that Plaintiff 'confirm'" his agreement to pay any duplication fees.   Pl.'s Reply at 12 (emphasis in original).   The regulation the Plaintiff refers to, 28 C.F.R. § 16.3(c), provides that

> If you make a FOIA request, it shall be considered an agreement by you to pay all applicable fees charged under § 16.11, up to $25.00, unless you seek a waiver of fees.   The component responsible for responding to your request ordinarily will confirm this agreement in an acknowledgement letter.   When making a request, you may specify a willingness to pay a greater or lesser amount.

28 C.F.R. § 16.3(c).   The Plaintiff is correct that if he elected to receive documents on a CD, the

---

[3]   For purposes of this motion, the Court assumes without deciding that an agency's failure to make responsive documents available "promptly" is an independent, actionable violation of the Freedom of Information Act.

estimated cost was only $25.  Hardy Decl., Ex. C.  However, because the Plaintiff failed to respond to the FBI's letter, the FBI had no way of knowing whether the Plaintiff would elect to receive responsive documents on a disk, thus incurring no more than $25 in duplication fees, *or* whether the Plaintiff would elect to receive the documents hard copy, thus incurring up to $112.30 in duplication fees.  Section 16.3(c) did not come into play unless and until the Plaintiff indicated in which format responsive documents should be produced.  This regulation did not relieve the Plaintiff of his obligation to respond to the FBI's October 19 letter

The Plaintiff also takes issue with the FBI's attempt to, according to the Plaintiff, "roll[] out a meritless exhaustion argument that it has not previously raised."  Pl.'s Reply at 10.  This is not an issue of exhaustion.  At the point the Plaintiff failed to respond to the FBI's October 19 letter, pursuant to the applicable regulations and the Freedom of Information Act itself, the FBI was under no obligation to continue processing the Plaintiff's request.  For the same reason, the Plaintiff's attempt to recast his timeliness argument in his Reply is unpersuasive.  The Plaintiff argues that the FBI acknowledged the fee issue was moot in August 2012, but did not produce responsive documents until January 2013.  Pl.'s Reply at 13.  As a threshold matter, the Court shall deny the Plaintiff's motion for summary judgment on this basis because the Plaintiff did not raise this argument until his reply brief, at which point the FBI has no opportunity to respond. *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008).  Moreover, this argument ignores the fact that the FBI's statutory obligation to respond "promptly" terminated in November 2011 when the Plaintiff failed to respond to the agency's October 19, 2011, letter. The Plaintiff offers no authority for the proposition that the FBI's decision to produce documents in response to this litigation triggered any statutory duty to produce documents within a particular time frame.  Therefore, the Plaintiff is not entitled to summary judgment on its claim

that the FBI failed to make the responsive records "promptly available."

B.       *Adequacy of the FBI's Search*

"An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 390 (D.C. Cir. 1999) (citation omitted). "At summary judgment, a court may rely on [a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Ancient Coin Collectors Guild*, 641 F.3d at 514 (citation omitted). "The agency cannot limit its search to only one or more places if there are additional sources that are likely to turn up the information requested." *Valencia-Lucena*, 180 F.3d at 391 (citation omitted). Ultimately, the adequacy of a search is "determined not by the fruits of the search, but by the appropriateness of [its] methods." *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003) (citation omitted).

To establish the adequacy of its search for records responsive to Mr. Rosenberg's request, the FBI submitted two declarations from David M. Hardy, the Section Chief of the Record/Information Dissemination Section, Records Management Division of the FBI. Hardy Decl. ¶ 1. Mr. Hardy explains that in response to the Plaintiff's request, the FBI conducted a search of the FBI's Central Records System, or CRS. *Id.* ¶ 12. "The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes." *Id.* "The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter (or program)." *Id.* The files are indexed according "main" entries, that is, "the name corresponding with a subject of a file," and "reference" entries, which reflect "a mere mention or reference to an individual,

organization, or other subject matter, contained in a document located in another 'main' file on a different subject matter." *Id.* at ¶ 13. Here, the FBI conducted a search of the main CRS indices for "phonetic sounds of the last, middle, and first names relating to the following name: 'Sholom Mordechai Rubashkin and Agriprocessors Inc.'" *Id.* at ¶ 18. After the Plaintiff filed suit, the FBI also conducted a search for any cross-references to Agriprocessors Inc. or Sholom Mordechai Rubashkin. *Id.* at ¶ 19. The Plaintiff challenges the adequacy of the FBI's search in this case on three grounds, only the third of which is persuasive.

First, the Plaintiff argues the FBI's search was inadequate because ultimately the FBI only produced four pages of emails and failed to produce any communications "planning, scheduling, or referring" to various interagency meetings. Pl.'s Cross-Mot. at 5. "[I]t is long settled that the failure of an agency to turn up one specific document in its search does not alone render a search inadequate." *Ilturralde*, 315 F.3d at 315. In fact, the D.C. Circuit has explicitly held that the case law in this Circuit does not support the contention that an agency's search was inadequate "because it turned up only a few emails . . . even if the slim yield may be intuitively unlikely." *Ancient Coin Collectors Guild*, 641 F.3d at 514. "That the [FBI's] search turned up only a few emails . . . is not enough to render its search inadequate, even supposing that any reasonable observer would find this result unexpected." *Id.*

Second, the Plaintiff takes issue with the FBI's decision to limit its search terms to the "phonetic sounds of the last, middle, and first names relating to the following name: 'Sholom Mordechai Rubashkin and Agriprocessors Inc.'" Hardy Decl. ¶ 18. The Plaintiff argues that the FBI's search was not reasonably calculated to uncover all responsive documents because the FBI did not search for documents relating to "Iowa Turkey Products, Inc." Pl.'s Cross-Mot. at 6. In response, the FBI performed a search using "the phonetic sounds of the last, middle, and first

10

names relating to . . . 'Iowa Turkey Products Inc,'" but did not locate any potentially responsive documents. Second Hardy Decl. ¶ 5. The Plaintiff does not identify any additional search terms the FBI should have utilized, therefore this issue is moot. *See Hodge v. FBI*, 703 F.3d 575, 580 (D.C. Cir. 2013) ("[B]y the time a court considers the matter, it does not matter that an agency's initial search failed to uncover certain responsive documents so long as subsequent searches captured them.").

Third, the Plaintiff notes that the declaration provided by the FBI to establish the adequacy of its search does *not* state that "that searches of other record systems were not 'likely to turn up the information requested,' and does not aver that 'all files likely to contain responsive materials . . . were searched.'" Pl.'s Cross-Mot. at 6 (quoting *Nation Magazine, Wa. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995)). The FBI argues that it is not required to use the specific language quoted by the Plaintiff so long as it "conducts a reasonable search tailored to the nature of a particular request." Def.'s Reply at 12, 13 (quoting *Adionser v. Dep't of Justice*, 811 F. Supp. 2d 284, 293 (D.D.C. 2011)). The problem is that neither declaration submitted by Mr. Hardy avers or demonstrates that the FBI's search in this case was "tailored to the nature" of the Plaintiff's request. The FBI searched its Central Records System for responsive documents, but the FBI does not aver that the Central Records System is the only collection of files likely to contain responsive documents. *Cf. Ancient Coin Collectors Guild*, 641 F.3d at 514. Moreover, even when challenged by the Plaintiff as to the adequacy of its search for emails, the FBI did not assert in the Second Hardy declaration that the FBI searched all systems of records "likely to possess the requested information." *Blackwell v. FBI*, 680 F. Supp. 2d 79, 90 (D.D.C. 2010).

The FBI relies on the *Blackwell* decision to show that "[t]he exact method of search the

11

FBI utilized . . . has been upheld as an adequate search in this district under similar circumstances." Def.'s Reply at 13. Contrary to the FBI's assertion, it did not employ the "exact" same method of search in *Blackwell*; in addition to the Central Records System, the FBI also searched the Electronic Surveillance indices ("ELSUR") in response to the FOIA request at issue in *Blackwell*.[4] 680 F. Supp. 2d at 90. Moreover, Mr. Blackwell's request specified that the FBI should search its "mail files," "cross-references," and ELSUR indices for potentially responsive documents. *Id.* at 87. By contrast, Mr. Rosenberg did not limit his request to these databases, and in fact broadly defined his request for "documents" to include "backup servers or tapes." Hard Decl., Ex. A. at 2. Fundamentally, Mr. Rosenberg's request to the FBI in this case was broader than the request submitted by Mr. Blackwell. The Court agrees that certain types of documents requested by Mr. Rosenberg are likely to appear in the Central Records System, such as "[a]ny warrants granted for the proposed 2000 action against Agriprocessors, Inc.," and "[t]he information the FBI considered in its decision to conduct or participate in the [2008] raid." *Id.* at 2, 4. But neither Hardy declaration even attempts to establish that the requested communications between the FBI and various third parties prior to or after the raid are likely to be found in the Central Record System.[5] On this record, the FBI has failed to satisfy its burden to show that its search was reasonably calculated to uncover all relevant documents.

---

[4] The ELSUR database may not be likely to contain documents responsive to the Plaintiff's request in this case, but the Court has no way to make that determination based on the Hardy declarations.

[5] To be clear, the Court does not find that the search was inadequate insofar as the FBI failed to search for records retrievable by the names of third party individuals, an issue addressed by the Second Hardy declaration but not discussed by the Plaintiff. Second Hardy Decl. ¶ 6. Rather, the Court finds the FBI failed to meet its burden to show that the search it conducted was reasonably calculated to uncover all relevant communications between third parties that could be retrieved by conducting queries for "Agriprocessors Inc." or "Sholom Rubashkin."

### C.    FBI's Withholdings

The Plaintiff raises a number of objections to the FBI's processing of its request, including that the FBI failed to review 206 pages of the 1,223 potentially responsive pages initially located by the agency and that the FBI failed to provide "a detailed justification" for the withholding of 155 documents.  With respect to the first issue, the FBI explained that the 206 pages were found to be duplicates.  Def.'s Reply at 17; Second Hardy Decl. ¶ 8.  Moreover, the initial Hardy Declaration identified by bates-number every page, including withheld pages, on which a particular exemption was invoked to justify withholding information.  *E.g.*, Hardy Decl. at 16 n.11 (listing bates-numbered pages on which Exemptions 6 and 7(C) are cited).  The Hardy Declaration then explains in detail the basis for invoking each exemption, and in many cases it is unclear how Mr. Hardy could have provided any additional detail as to the basis for the exemption without revealing the very information the FBI withheld.

The Plaintiff further argues that the FBI failed to establish that it disclosed all reasonably segregable information.  The Freedom of Information Act instructs that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."  5 U.S.C. § 552(b); *see also Mead Data Ctr., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977) ("[N]on-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions.").  "The question of segregability is subjective based on the nature of the document in question, and an agency must provide a reasonably detailed justification rather than conclusory statements to support its claim that the non-exempt material in a document is not reasonably segregable."  *Cater, Fullerton & Hayes LLC v. Fed. Trade Comm'n*, 520 F. Supp. 2d 134, 146 (D.D.C. 2007) (citing *Mead Data*, 566 F.2d at 261).

In an attempt to show that it satisfied this obligation, the FBI relies on the statement by Mr. Hardy that "[t]he FBI has processed and released all reasonably segregable information from the records responsive to plaintiff's request." Hardy Decl. ¶ 50. This single statement, without any elaboration, is plainly inadequate. "The [FBI's] conclusion on a matter of law is not sufficient support for a court to conclude that the self-serving conclusion is the correct one." *Stolt-Nielsen Transp. Grp. Ltd. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008). Nevertheless, upon its own review of unredacted versions of the documents at issue in this case, the Court finds the FBI has produced to the Plaintiff all *reasonably* segregable, non-exempt information. *Mead Data*, 566 F.2d at 261 n. 55 ("[A] court may decline to order an agency to commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal or no information content."). Having resolved the Plaintiff's threshold objections to the FBI's response, the Court turns to the Plaintiff's objections to the FBI's application of specific exemptions.

   1.   Exemption 3

The FBI invoked Exemption 3 in conjunction with Federal Rule of Criminal Procedure to withhold "Federal Grand Jury" information within the records sought by the Plaintiff. Exemption 3 permits an agency to withhold any information that is

> specifically exempted from disclosure by statute (other than section 552b of this title), if that statute--
>
>> (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or
>>
>> (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and
>>
>> (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

5 U.S.C. § 552(b)(3).  Rule 6(e)(2)(B) and (3)(A) limits the disclosure of grand jury matters by government personnel.  Pursuant to these provisions, the FBI redacted "details concerning a Federal Grand Jury subpoena, including the name and identifying information of an individual subject to a Federal Grand Jury subpoena and information that identifies specific records or evidence subpoenaed by the Federal Grand Jury."  Hardy Decl. ¶ 25.  Upon review of the information *in camera*, the Court agrees that the FBI properly invoked Exemption 3.

### 2.   Exemptions 6 and 7(C)

#### a.   Redactions Generally

The Plaintiff further contends that the FBI improperly invoked Exemptions 6 and 7(C) "to redact extensive information—sometimes including entire paragraphs—and not just names or other unique information that could identify a third party."  Pl.'s Cross-Mot. at 11.  FOIA Exemption 6 provides that an agency may withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Similarly, Exemption 7(C), in relevant part, permits an agency to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  *Id.* § 552(b)(7)(C).  "The courts have construed this provision as permitting exemption if the privacy interest at stake outweighs the public's interest in disclosure." *Nation Magazine*, 71 F.3d at 893.  The Plaintiff does not dispute the fact that the records at issue in this case were compiled for law enforcement purpose as required for Exemption 7(C).  Therefore, the Court has "no need to consider Exemption 6 separately because all information that would fall within the scope of Exemption 6 would also be immune from disclosure under Exemption 7(C)."  *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161,

1171 (D.C. Cir. 2011).

On a large portion of the pages on which the FBI invoked Exemptions 6 and 7(C), the FBI also invoked 7(D). The Court shall address these documents upon receipt of the Government's supplement regarding its use of Exemption 7(D) as outlined below. The Court also reviewed every page on which the FBI cited Exemptions 6 and 7(C). On several pages the FBI redacted information describing actions taken (or not taken) by third parties that does not appear to identify any third party whose identity might be protected by Exemption 6 or Exemption 7(C). Therefore, the FBI must either revise its redactions or provide a supplemental explanation of the use of Exemptions 6 and 7(C) with respect to the following pages:

| | |
|---|---|
| Rubashkin-4 | Rubashkin-546 through Rubashkin-548 |
| Rubashkin-18, specifically the first two words after the unredacted phrased "CSB, can testify" | Rubashkin-555 |
| Rubashkin-19, specifically the first four words of the third line in Section XII | Rubashkin-793 through Rubashkin-795 |
| Rubashkin-70 | Rubashkin-874 |
| Rubashkin-74 through Rubashkin-76 | Rubashkin-924, specifically the domain name for any email addresses |
| Rubashkin-171, specifically the four words after the unredacted phrase "same person that is shown" | Rubashkin 934 through Rubashkin 935 |
| Rubashkin-258 through Rubashkin-259 | Rubashkin-1004 through Rubashkin-1008 |
| Rubashkin-323 | |

On the remaining pages citing Exemptions 6 and 7(C) as the basis for various withholdings, it is clear that the FBI redacted only the names and identifying information of FBI Special Agents and support employees, third parties who provided information to the FBI, third

parties mentioned in documents, third parties of investigative interest to the FBI, and local law enforcement personnel. With the exception of any redactions relating for Chief Judge Linda Reade, the Plaintiff does not dispute that the privacy interests of the third parties mentioned in the documents at issue in this case would be compromised by disclosure of the withheld information, and does not suggest that release of the information would advance any significant public interest. *See Roth*, 642 F.3d at 1174-75. Therefore, except as set forth above, the FBI is entitled to summary judgment with respect to its use of Exemptions 6 and 7(C).

b.      Information Regarding Chief Judge Reade

The Plaintiff indicates that "[a] significant purpose of Plaintiff's FOIA request was to discover the extent of the involvement of Chief Judge Linda Reade, who presided at Mr. Rubashkin's trial, or her court staff in the pre-trial investigation and decision to prosecute Mr. Rubashkin." The Plaintiff alleges that the FBI redacted Chief Judge Reade's name from Rubashkin-942, a letter from a citizen to the Department of Justice alleging a female judge "was involved in the prosecution prior to the trial and therefore could not be impartial in the trial." The Plaintiff argues that disclosure of Chief Judge Reade's name in any documents responsive to the Plaintiff's request does not implicate any privacy interests on the part of Chief Judge Reade for two reasons: (1) the unredacted portions of Rubashkin-942 indicate Chief Judge Reade is the subject of the letter; and (2) the letter "reiterates allegations regarding Chief Judge Reade that already are in the public domain." Pl.'s Cross-Mot. at 13. An individual's privacy interest is not diminished by the fact the requestor can "guess the individual's identity," or may be able to determine that individual's identity through other means. *Schoenman v. FBI*, 573 F. Supp. 2d 119, 149 (D.D.C. 2008).

For the first time in his reply brief, the Plaintiff argues that "Chief Judge Reade does not

qualify as the type of individual whose privacy FOI may protect because . . . she is not a subject[], witness[], or informant[] in a law enforcement investigation."  Pl.'s Reply at 3 (citation omitted).  The Plaintiff forfeited this argument by failing to raise it in his Cross-Motion.  *Am. Wildlands*, 530 F.3d at 1001.  Even if this argument was properly raised by the Plaintiff, it is answered by the very next sentence in the Plaintiff's own brief: the FBI redacted the names of third parties that were "merely mentioned" in documents.  Pl.'s Reply at 4; *see also Sussman v. U.S. Marshal Servc.*, 494 F.3d 1106, 1115 (D.C. Cir. 2007) (upholding application of Exemption 7(C) to redact names of "other government employees" and "third-party individuals").  Moreover, the fact that Chief Judge Reade is a public official does not extinguish her privacy interests.  "It is well established, [] that government officials do not surrender all rights to personal privacy when they accept a public appointment.  While an individual's official position may enter the 7(C) balance, it does not determine, of its own accord, that the privacy interest is outweighed."  *Bast v. U.S. Dep't of Justice*, 665 F.2d 1251, 1255 (D.C. Cir. 1981) (internal citation omitted).  Therefore, the Court must proceed with balancing Chief Judge Reade's privacy interest with the public interest asserted by the Plaintiff.

The Plaintiff argues that any privacy interest in the documents in this case Chief Judge Reade might have is outweighed by the public's interest "in uncovering alleged misconduct by a federal judge and prosecuting agencies."

> [W]here there is a privacy interest protected by Exemption 7(C) and the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure.  Rather, the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred.

*Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2003).  The Plaintiff alleges that Chief Judge Reade "was involved in planning the raid on Mr. Rubashkin's business" that the led

to the arrest of hundreds of illegal immigrants and "in making the decision to investigate and prosecute Mr. Rubashkin." Pl.'s Reply at 5. In support of his claim that Chief Judge Reade engaged in misconduct, the Plaintiff submits seven pages of documents produced by Immigrations and Customs Enforcement. Pl.'s Ex. D. A "Synopsis" dated October 17, 2007 states that

> The USAO also stated that they have briefed Chief United States District Court Judge Linda Reade regarding the ongoing investigation and their expectation that it is anticipated to result in several hundred criminal arrests and subsequent criminal prosecutions within the judicial boundaries of the Northern District of Iowa. Judge Reade indicated full support for the initiative, but pointed out that significant planning and preparation will be required to allow the Court to clear docket time, request additional Judges, Court Reporters, Court Certified Interpreters, support staff, and facilities to conduct Judicial proceedings. It was pointed out that the judicial calendar is prepared many months in advance and as such the enforcement phase of this investigation should be planned for the spring of 2008. Judge Reade further advised that she would be out of the country and unavailable for all of February and half of March 2008.

Pl.'s Ex. D at 6. Further, the Synopsis indicated that the United States Attorney's Office planned "to have structured plea agreements prepared and agreed to in advance of proceedings with the U.S. Public Defenders Office. . . . The concept involves the majority of defendants promptly entering into a plea agreement upon arrest thus expediting the prosecutorial, judicial, and removal process." *Id.* A second synopsis dated March 17, 2008, indicates that

> On March 17, 2008, RAC Cedar Rapids met with the USAO, U.S. Probation, the USMS, and the United States District Court staff to include the U.S. Magistrate Judge and U.S. Chief District Court Judge. The parties discussed an overview of charging strategies, numbers of anticipated arrests and prosecutions, logistics, the movement of detainees, and other issues related to the CVJ investigation and operation. The Chief District Court Judge requested that ICE and/or USMS ensures that the detainees take showers and are wearing clothing that is not contaminated when appearing in court. The next meeting with the Court will be set for the first week of April.

Pl.'s Ex. D at 8; *see also id.* at 4 (3/31/2008 email stating that "[t]he First Assistant for the Northern District Rich Murphy indicated that he has a meeting this Friday (April 4) with the

Chief Judge who has requested a briefing on how the operation will be conducted"); *id.* at 2 (4/1/2008 "Executive Summary" reflecting that "[i]n coordination with the U.S. Attorney's Officer for the Northern District of Iowa (USAO), and the United States District Court in the Northern District of Iowa, the RAC Cedar Rapids is currently planning a worksite enforcement operation in northeastern Iowa at Agriprocessors, Inc.").

The documents submitted by the Plaintiff establish that Chief Judge Reade was involved in coordinating the logistics for the processing the 600 individuals law enforcement agencies anticipated would be arrested as part of the raid on Agriprocessors. Pl.'s Ex. D at 2. As the Chief Judge of the District in which the arrests would take place, it is not surprising that Chief Judge Reade would be involved in ensuring that sufficient judges, court reporters, interpreters, and facilities were available to arraign and otherwise process the arrestees in a timely manner. Yet the Plaintiff offers no explanation as to why Chief Judge Reade's involvement in making arrangements for the processing of hundreds of anticipated arrestees was "improper" or otherwise constituted "misconduct." Moreover, there is nothing in any of the documents submitted by the Plaintiff to indicate that Chief Judge Reade was involved in making the decision to investigate Agriprocessors or Mr. Rubashkin, or in the decision to prosecute Mr. Rubashkin. On this record, no reasonable person would believe Chief Judge Reade engaged in misconduct.

On June 14, 2013, the Plaintiff filed a "supplement" to his motion for summary judgment, attaching a number of articles discussing accusations of misconduct by a different judge. The Plaintiff attached three newspaper articles published in June 2013 discussing accusations that U.S. District Judge Stephanie Rose sent *ex parte* emails to attorneys within the United States Attorney's Office for the Northern District of Iowa ordering prosecutors to submit

evidence that Judge could rely on to increase a defendant's sentence.  Pl.'s Suppl., Exs. A-C.

The Plaintiff argues that "Judge Rose's emulation of Chief Judge Reade's improper conduct suggests that such communications are and were accepted practice in the Northern District of Iowa, and may have tainted Mr. Rubashkin's conviction and sentence."  Pl.'s Suppl. at 2.  The fact that a different Judge allegedly engaged in improper communications with prosecutors in a different case five years after the raid of the Agriprocessors is insufficient evidence for a reasonable person to believe Judge Reade might have engaged in misconduct in Mr. Rubashkin's case.[6]

Assuming *arguendo* that the Plaintiff provided sufficient evidence of misconduct to show a significant public interest, the Plaintiff would face a final hurdle of demonstrating "that the information he seeks 'is likely to advance that interest.'"  *Roth*, 642 F.3d at 1175 (quoting *Favish*, 541 U.S. at 172).  The Plaintiff himself asserts that the letter purportedly referring to Chief Judge Reade simply reiterates allegations regarding Chief Judge Reade in the public domain.  Pl.'s Cross-Mot. at 13 (citing Lynda Waddington, *Rubashkin hopes for new trial denied*, Iowa Indep., Nov. 29, 2010 (Rubashkin-947-948)).  The Plaintiff offers no explanation as to how a letter from a citizen to the Department of Justice repeating the same allegations would advance the public interest in uncovering alleged misconduct on the part of Chief Judge Reade.  Based on the Court's *in camera* review of the redacted and withheld documents, including the documents regarding "pre-trial meetings" mentioned in the Plaintiff's Cross-

---

[6]  With respect to the documents produced by Immigration and Customs Enforcement mentioning Chief Judge Reade, Pl.'s Suppl. Ex. E, the Plaintiff fails to explain why the documents that are not duplicative of Exhibit D to his Cross-Motion were not previously presented to the Court, therefore the Court declines to consider these documents.  Moreover, none of the documents newly submitted to the Court, in combination with the documents previously filed, would lead a reasonable person to believe Chief Judge Reade might have engaged in misconduct.

Motion, the Court finds none of the information withheld pursuant to Exemptions 6 and 7(C) corroborate the Plaintiff's allegations of misconduct, thus the FBI acted appropriately to the extent it redacted any information regarding Chief Judge Reade pursuant to Exemptions 6 and 7(C). *Roth*, 642 F.3d at 1178.

### 3. Exemption 7(D)

The Plaintiff also takes issue with the FBI's invocation of Exemption 7(D). Pl.'s Cross-Mot. at 11-12.

> Where, as here, the records at issue were "compiled by criminal law enforcement authorit[ies] in the course of a criminal investigation," they are covered by Exemption 7(D) if producing the records "could reasonably be expected to disclose the identity of a confidential source" or "information furnished" by such a source. U.S.C. § 552(b)(7)(D). The agency invoking Exemption 7(D) bears the burden of proving that it applies, and with respect to the FBI, it is not enough for the agency to claim that all sources providing information in the course of a criminal investigation do so on a confidential basis.

*Roth*, 642 F.3d at 1184. "When no express assurance of confidentiality exists, courts consider a number of factors to determine whether the source nonetheless 'spoke with an understanding that the communication would remain confidential.'" *Id.* (quoting *U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 172 (1993)). The relevant factors include "the character of the crime at issue," "the source's relation to the crime," whether the source received payment, and whether the source has an "ongoing relationship" with the law enforcement agency and typically communicates with the agency "only at locations and under conditions which assure the contact will not be noticed." *Landano*, 508 U.S. at 179.

Through the Hardy Declaration, the FBI explained that the individuals at issue in this case "were interviewed under circumstances in which an assurance of confidentiality may be implied since the individuals were reporting on fraudulent financial activities concerning the plaintiff and others," and "[i]f the interviewee's identities were to be released, it would likely

subject them to harassment or reprisal."  Hardy Decl. ¶ 46.  The Plaintiff did not challenge Mr.

Hardy's representations in his initial motion; the entirety of the Plaintiff's argument regarding

Exemption 7(D) in his cross-motion is that the FBI "redact[ed] significant portions of

documents, including entire paragraphs that appear to sweep in non-exempt information

regarding the long-completed investigation and prosecution of Mr. Rubashkin that FOIA

required the FBI to segregate and disclose."  Pl.'s Cross-Mot. at 11-12.  It was not until his reply

brief that the Plaintiff challenged the adequacy of FBI's showing that the interviewees were

*implicitly* assured that their identities would remain confidential.  Accordingly, the Court shall

provide the FBI an opportunity to respond to the new argument in the Plaintiff's reply before the

Court determines whether the FBI is entitled to summary judgment regarding its use of

Exemption 7(D).

          4.      <u>Exemption 7(E)</u>

Finally, the Plaintiff challenges the FBI's application of Exemption 7(E) to redact

portions of Rubashkin-734 and Rubashkin-735.  Pl.'s Cross-Mot. at 12.  Exemption 7(E)

authorizes an agency to withhold

> records or information compiled for law enforcement purposes, but only to the
> extent that the production of such law enforcement records or information . . .
> would disclose techniques and procedures for law enforcement investigations or
> prosecutions, or would disclose guidelines for law enforcement investigations or
> prosecutions if such disclosure could reasonably be expected to risk
> circumvention of the law

5. U.S.C. § 552(b)(7)(E).  The FBI refers to the two types of documents potentially subject to

this exemption as 7(E)-1 (information that would disclose techniques and procedures) and 7(E)-2

(information that would disclose guidelines for law enforcement investigations).

The Plaintiff argues that the FBI improperly relied on Exemption 7(E)-1 to redact

"suggestions of fact-bound questions to ask a witness assisting with Mr. Rubashkin's defense."

23

Pl.'s Cross-Mot. at 12. The FBI argues that the suggestion of fact-bound questions "occurred pursuant to internal FBI procedures and technique, specifically as part of the FBI's 'internal investigative methodology in the investigation of financial crimes.'" Def.'s Reply at 25 (quoting Hardy Decl. ¶ 48). But the document itself tells a different story. The unredacted text provided to the Plaintiff indicates that

> On October 1st and 2nd, 2009 a half page ad in the Des Moines Register appeared which questioned the governments [sic] treatment of Sholom Rubashkin. The ad contained factual inaccuracies regarding the government raid of the Postville plant and was paid for by "Friends of Sholom Rubashkin, 266 47thStreet, Brooklyn NY 11204".

> The United States Attorney's Office, Northern District of Iowa, believes the Des Moines Register ad could have been placed in order to influence the jury pool for the upcoming trial. Should this be the case, Obstruction of Justice charges will be pursued against those involved.

> It is requested that NY attempt to interview [REDACTED] as expeditiously as possible due to the upcoming trial. The following questions should be asked: [REDACTED].

Rubashkin-734. There is nothing to suggest the questions that followed this text were suggested pursuant to the "internal investigative methodology in the investigation of financial crimes"; the document clearly indicates the agency was investigating potential obstruction of justice charges against whomever was believed to be responsible for placing the newspaper advertisement Moreover, the FBI offers no explanation as to how revealing the specific questions the agency suggested be asked as part of an investigation of possible obstruction of justice through the placement of a newspaper ad concerning an upcoming trial "could reasonably be expected to risk circumvention of the law."

With respect to the remaining applications of Exemption 7(E)-1, the Court's *in camera* review reveals that what was redacted and withheld from most of the documents does in fact reflect the FBI's "internal investigative methodology in the investigation of financial crimes."

Hardy Decl. ¶ 48.  Accordingly, the FBI "need[] only [] demonstrate logically how the release of the requested information might create a risk of circumvention of the law."  *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011) (citation omitted).  The Hardy Declaration explains that "disclosure would provide perpetrators with a tangible reference that could be used to alter behavior and thwart detection."  Hardy Decl. ¶ 48.  Though somewhat conclusory, the Court agrees that the FBI has met its burden to show Exemption 7(E)-1 applies, except as to the information redacted from Rubashkin-56, Rubashkin-139, and Rubashkin-157.  It is unclear from the Court's review how the information on these three pages reflects internal FBI methodology, or how the disclosure of this information would enable perpetrators to alter their behavior and thwart detection.  Therefore, the FBI shall be required to supplement its motion.

The FBI invoked Exemption 7(E)-2 to justify withholding a portion of the FBI Form FD-515, a form used by the FBI to "report investigative accomplishments."  Hardy Decl. ¶ 49.  Specifically, the FBI withheld a block captioned "Investigative Assistance and Techniques Used," which "lists 27 publicly known investigative techniques and/or assistance, some of which were used by the investigative personnel during the investigation.  Opposite each investigative technique and assistance is a rating column which evaluates the effectiveness of each technique/assistance used in bringing the investigation to a successful conclusion."  *Id.*  The FBI argues that since it will use the same or similar techniques and/or assistance as part of similar investigations in the future, "[i]f the ratings columns were released," individuals involved in criminal activity "could change their activities and modus operandi in order to avoid detection and/or surveillance in the future," a claim the Plaintiff does not dispute.  *Id.*  Although the Hardy Declaration is somewhat conclusory, the Court agrees that logically, if an individual knows which investigative techniques the FBI employs in this type of investigation and how effective

the FBI believes those techniques to be, perpetrators may be able to circumvent the law and avoid detection in the future. Therefore, the FBI is entitled to summary judgment with respect to its application of Exemption 7(E) to statistical information contained in effectiveness ratings on FD-515 forms.

## IV. CONCLUSION

The Plaintiff is not entitled to summary judgment on his claim that the FBI failed to promptly produce responsive documents because the FBI was under no obligation to comply with the time limits of the Freedom of Information Act once the Plaintiff failed to respond to the FBI's letter regarding anticipated fees. For its part, the FBI is not entitled to summary judgment as to the adequacy of its search because it failed to demonstrate the agency searched all files likely to contain responsive documents. The FBI shall be required to justify why information redacted on twenty seven specific pages would reveal the identities of law enforcement personnel, witnesses, or third parties, and the Court shall reserve judgment as to the FBI's use of Exemptions 6 and 7(C) in combination with Exemption 7(D) pending further explanation from the FBI regarding its claim that interviewees were implicitly guaranteed that that their identities would remain confidential as required to invoke Exemption 7(D). Otherwise, the FBI met its burden to show that it properly invoked Exemptions 6 and 7(C). Finally, the FBI failed to meet its burden to show that information redacted from five pages on the grounds the information reflected investigative techniques and/or procedures in fact revealed those procedures, or that the release of that information could reasonably be expected to risk circumvention of the law. However, the FBI demonstrated that it was entitled to redact statistical information contained in effectiveness ratings on FD-515 forms pursuant to Exemption 7(E). Accordingly, the FBI's [47] Motion for Summary Judgment is GRANTED IN PART and HELD IN ABEYANCE. The

Plaintiff's [51] Cross-Motion for Summary Judgment is HELD IN ABEYANCE and otherwise

DENIED.  An appropriate Order accompanies this Memorandum Opinion.

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
UNITED STATES DISTRICT JUDGE